**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **CIVIL ACTION** |
| ) | |
| v. ) | No. 06-10264-MLB |
| ) | |
| SCOTT A. JARVI, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter comes before the court on defendant's motion to suppress (Doc. 13) and motion in limine (Doc. 19). The motions have been briefed (Docs. 18, 20) and the court conducted an evidentiary hearing on March 26, 2007. The motion to suppress is DENIED and the motion in limine is DENIED for the reasons stated herein.

**I. FACTS**

This case arises from a traffic stop on the evening of November 9, 2005 in Wichita, Kansas. Keith Allen, a deputy with the Sedgwick County Sheriff's Office for thirteen years, and fellow deputy Hank Cocking stopped Scott Jarvi for committing an improper lane change. Ronda Higgins was a passenger in Jarvi's vehicle at the time of the stop. The parties stipulate that the deputies obtained Ronda Higgins' name while conducting the roadside stop of Jarvi's vehicle.

Matthew Lynch, a ten-year veteran of the Sedgwick County Sheriff's Office and a narcotics detective for the previous four years, interviewed Higgins after she was brought into the sheriff's

office by Allen and Cocking.¹  The interview room Higgins was placed in was a small, approximately eight foot by eight foot, room with a table and two or three chairs.  Lynch and Higgins were the only two individuals in the room during Lynch's interview of Higgins.  During her interview, Higgins was not restrained, spoke English, and had no difficulty communicating with Lynch.  Higgins' demeanor appeared to Lynch to be appropriate for the situation; Higgins was nervous and talked as much as, or more than, an average person in her situation.

Lynch took down Higgins' demographic information (name, address, physical description, etc.) and then read Higgins her <u>Miranda</u> rights. Lynch read Higgins' rights out loud to Higgins and had her write her initials next to each.  Higgins signed that she understood her rights but was wishing to waive them and speak.  Lynch also signed the <u>Miranda</u> waiver and then dated and timed it.  Higgins additionally executed a consent form for deputies Allen and Cocking and detective Lynch to search her vehicle, which she told them was parked at the Jarvi residence.²  No audio or video recording was taken of Lynch's

---

¹ Higgins was arrested for possessing prescription pills in her purse without evidence of a valid prescription (the pills were loose in an unmarked pillbox).  Lynch never followed-up on Higgins' statement to him that she did have a prescription for the pills. Higgins has never been charged for this alleged act or any other act arising out of the events the night of November 9, 2005.

² On the consent to search form, Higgins wrote and signed the following: "Any drugs and or paraphernala [sic] or incriminating evidence guns or anything ilegal [sic] be taken fingerprints of." From his conversations with Higgins that evening, Lynch understood that Higgins consented to the search of her vehicle, but that she did not believe there was anything illegal in the vehicle.  Therefore, if something illegal was found, Higgins wanted fingerprints to be taken to identify the true owner of that contraband.
Regardless, no testimony was adduced regarding the search of Higgins truck, and there is certainly no testimony of any contraband from Higgins' truck that is being used as evidence against Jarvi.

-2-

interview of Higgins.  Lynch did not deem that it was necessary to have an audio or video recording and the recording system was not in good working order at the time.  Over the course of Lynch's communications with Higgins, Higgins never requested counsel or indicated that she wanted to stop the interview.

Higgins discussed with Lynch the length of her stay in Wichita and her relationship with Jarvi.[3]  Higgins stated that she had recently used methamphetamine at Jarvi's home and had witnessed firearms, currency, and methamphetamine at Jarvi's home. Higgins also reported the presence of certain materials, which Lynch recognized could be used to set up a "booby trap" at the Jarvi residence.  Lynch believed Higgins' statements were credible because they were statements against Higgins' self-interest.  Lynch also believed Higgins' statements were credible because Higgins showed Lynch the injection site from her recent use of methamphetamine, which Lynch recognized as a needle injection site at a location on the body that methamphetamine would normally be injected.

Lynch never had a conversation with Higgins regarding the need for Higgins to help herself by speaking with him, and Lynch did not have a desire to have Higgins become a confidential informant.  Lynch did express to Higgins a generic mandate that Higgins should be honest.  Lynch did not run a criminal history report on Higgins at the time of the interview because Higgins was not a "confidential source" and because Higgins' name would be included in any subsequent application for a search warrant, both of which factors amplified

---

[3] Lynch stated that Higgins never satisfactorily explained her relationship with Jarvi.

-3-

Lynch's belief in Higgins' credibility.

Lynch applied for a search warrant from Judge Owens of the Sedgwick County District Court. On the application for the warrant, Lynch related the following:

> On November 9th, 2005 at approximately 1530 hours Deputies Hank Cocking and Keith Allen received a tip for a confidential source of information stating Kelly Hemphill of 5011 Meadowview was selling methamphetamine out of his residence. While following up on the provided information the Deputies observed a bronze in color 1999 GMC truck parked in front of the residence.
>
> At approximately 2010 hours the Deputies observed the truck leave the residence and commit a traffic violation at 47th Street South and Clifton. The vehicle was a bronze in color 1999 GMC truck bearing Kansas UGT554, which was registered in the state of Kansas to Scott A. Jarvi. During the investigation of the traffic stop the driver was identified as Scott A. Jarvi, white male, 09-01-1958 of 602 North Oliver, Wichita, Sedgwick County, Kansas and the passenger was identified as Rhonda [sic] J. Higgins, white female, 01-25-1966 of Ponca City Oklahoma. At the conclusion of the traffic stop the two were asked for consent to search the vehicle and their own personal items. During the subsequent canine sniff [of] the vehicle Police Service Dog Rommel alerted to a package in the bed area of the truck. Deputy Allen further inspected the package and located approximately 56 grams of a substance, which field-tested positive for the presence of methamphetamine. The methamphetamine was located inside the original box packaging for a small flashlight. Deputy Allen hand searched a bag that Higgins had identified as belonging to her and he located multiple tablets of prescription pain medication not contained within a prescription bottle nor was Higgins able to provide a prescription for the medication. Both parties were arrested and transported to the Sedgwick County Sheriff's Office investigations division for interviewing.
>
> At approximately 2140 hours your Affiant conducted an interview with Higgins in which she stated she had been staying with Jarvi at 602

North Oliver since her arrival in Wichita on November 7th, 2005. Higgins also stated she has been a methamphetamine user for approximately 3 years. During the interview with your Affiant Higgins confessed to using methamphetamine at Jarvi's residence, which Jarvi had given her by way of an injection into her right arm. Your Affiant verified what appeared to be a fresh injection site on Higgins's left arm. It was clear from your Affiant's interview that Higgins has spent nearly all her time in Wichita with Jarvi and when not in his direct company she was left inside the residence at 602 North Oliver. When your Affiant questioned Higgins about the flashlight container the methamphetamine was located in she stated she had observed a young white male by the name of Ryan give Jarvi the flashlight as a gift on Monday. Higgins stated she again observed the flashlight box setting on the kitchen counter of the residence sometime during the last 72 hours. Higgins also stated Jarvi had shown her what he stated was $3000.00 in United Stated [sic] currency and that he had to drop it off to someone. At the conclusion of your Affiant's interview, Deputy Cocking questioned Higgins further and she stated that at approximately 1400 hours on November 9th, 2005 she had been in the basement area of the residence at 602 North Oliver and observed a clear plastic container with a blue top which contained two (2) to three (3) ounces of methamphetamine. Higgins stated in close proximity to the container of methamphetamine was a digital scale and a spoon with residue on it.

At approximately 1122 hours on November 9th, 2005 your Affiant began an interview with Jarvi and stated the truck he was driving was one of his vehicles and he identified 602 North Oliver, Wichita, Sedgwick County, Kansas as his address. A records check verified 602 North Oliver has been Jarvi's residence since September 3rd, 2005. Prior to invoking his Miranda rights Jarvi stated he had lost a job at Raytheon Aircraft for a positive result on a urinalysis for methamphetamine.

Higgins reported that she had observed Jarvi in possession of two different handguns since Monday and that he had what is commonly referred to as a 'knee knocker' style booby trap set up in the residence.

(Exh. 3 at 3-4.)  Lynch states that even without the information relating to the traffic stop, the methamphetamine seized in the flashlight box as a result thereof, and the statements of Jarvi, he would have still applied for the search warrant of the Jarvi residence.

The next morning, prior to the execution of the search warrant, but after application was made for the warrant, the bomb squad of the Sedgwick County Sheriff's Office also spoke with Higgins to gather more information about the potential for "booby traps" at the Jarvi residence.  Higgins was also cooperative during this second interview.

When the search warrant was executed at the Jarvi residence, officers found and seized currency, firearms, ammunition, methamphetamine, paraphernalia, wood, rat traps, computers and miscellaneous hardware, safes, miscellaneous paperwork, prescription medications, and a holster.  A "booby trap" had not been set up at the Jarvi residence, but materials were found that could have been used for such a set up.

## II.  ANALYSIS

A.  Motion to Suppress

Jarvi files his motion to suppress because he believes his Fourth Amendment rights have been violated.  Jarvi asserts that his rights were violated when Allen and Cocking detained him after completing the traffic stop on November 9, 2005 and then asserts that Allen and Cocking did not have probable cause to search his truck.[4]  Jarvi asks

---

[4] Jarvi alleges that after the traffic stop was completed he refused consent to search his truck. Nevertheless, Allen and Cocking searched the truck by hand while waiting for a drug dog and then had the drug dog search the truck. Jarvi argues that without consent or

-6-

for "an order quashing his arrest and suppressing all physical evidence and statements obtained by law enforcement officers following his unlawful detention on November 9, 2005." (Doc. 13 at 1.)

At the evidentiary hearing on Jarvi's motion to suppress, Jarvi made it clear that he was not challenging the validity of the traffic stop. The court was also informed, by the government, that the government was "conceding" the drugs found by officers Allen and Cocking in Jarvi's truck after the traffic stop. The government asserts, however, that Jarvi's motion should be denied because probable cause existed to support the search warrant of Jarvi's residence, even without the information contained in the search warrant relating to the traffic stop and methamphetamine found after the stop. The government asserts that, by removing any "tainted" portions and with the following portions of the search warrant remaining, probable cause exists:

> On November 9th, 2005 at approximately 1530 hours Deputies Hank Cocking and Keith Allen received a tip for a confidential source of information stating Kelly Hemphill of 5011 Meadowview was selling methamphetamine out of his residence. While following up on the provided information the Deputies observed a bronze in color 1999 GMC truck parked in front of the residence.
>
> At approximately 2010 hours the Deputies observed the truck leave the residence and commit a traffic violation at 47th Street South and Clifton. The vehicle was a bronze in color 1999 GMC truck bearing Kansas UGT554, which was registered in the state of Kansas to Scott A. Jarvi. During the investigation of the traffic stop the driver was identified as Scott A. Jarvi, white male, 09-01-1958 of 602 North Oliver,

---

probable cause to search, the actions of Allen and Cocking violated his Fourth Amendment rights.

> Wichita, Sedgwick County, Kansas and the passenger was identified as Rhonda [sic] J. Higgins, white female, 01-25-1966 of Ponca City Oklahoma.
>
> At approximately 2140 hours your Affiant conducted an interview with Higgins in which she stated she had been staying with Jarvi at 602 North Oliver since her arrival in Wichita on November 7th, 2005. Higgins also stated she has been a methamphetamine user for approximately 3 years. During the interview with your Affiant Higgins confessed to using methamphetamine at Jarvi's residence, which Jarvi had given her by way of an injection into her right arm. Your Affiant verified what appeared to be a fresh injection site on Higgins's left arm. It was clear from your Affiant's interview that Higgins has spent nearly all her time in Wichita with Jarvi and when not in his direct company she was left inside the residence at 602 North Oliver. Higgins also stated Jarvi had shown her what he stated was $3000.00 in United Stated [sic] currency and that he had to drop it off to someone. At the conclusion of your Affiant's interview, Deputy Cocking questioned Higgins further and she stated that at approximately 1400 hours on November 9th, 2005 she had been in the basement area of the residence at 602 North Oliver and observed a clear plastic container with a blue top which contained two (2) to three (3) ounces of methamphetamine. Higgins stated in close proximity to the container of methamphetamine was a digital scale and a spoon with residue on it.
>
> A records check verified 602 North Oliver has been Jarvi's residence since September 3rd, 2005.
>
> Higgins reported that she had observed Jarvi in possession of two different handguns since Monday and that he had what is commonly referred to as a 'knee knocker' style booby trap set up in the residence.

(Exh. 4 at 3-4.)  Because Jarvi cannot pursue alleged violations of Higgins' rights, he has no standing to challenge the application for the search warrant as stated.  <u>Alderman v. United States</u>, 394 U.S. 165, 171-72 (1969) ("The established principle is that suppression of

the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.  Coconspirators and codefendants have been accorded no special standing.").  The search warrant application, as stated, relates information only from the traffic stop, which Jarvi concedes was valid, and from Higgins' interview, which Jarvi has no standing to challenge.

It is also clear that probable cause for granting a search warrant can be found, even when allegedly tainted information is included in a search warrant, by excising the allegedly tainted material, as long as probable cause exists without that material.  United States v. Karo, 468 U.S. 705, 719 (1984) ("However, if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid." (citing Franks v. Delaware, 438 U.S. 154, 172 (1978))); United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996) ("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause.").

Therefore, the question before the court is whether probable cause existed for the issuance of a search warrant, even without the allegedly improper detention and search of Jarvi on November 9, 2005. A finding of probable cause is to be determined from the "totality of the circumstances."  United States v. Basham, 268 F.3d 1199, 1203 (10th Cir. 2001).  "Probable cause to issue a search warrant exists only when the supporting affidavit sets forth facts that would lead a prudent person to believe there is a fair probability that

contraband or evidence of a crime will be found in a particular place." Id.; see also United States v. Fisher, 33 Fed. Appx. 933, 936 (10th Cir. 2002) (stating that "in assessing the state court judge's issuance of the [search] warrant, our inquiry is deferential. We must ensure that the state court judge had a substantial basis for concluding that the affidavit in support of the warrant established probable cause." (internal quotations, citations and alterations omitted)).

In this case, probable cause existed for the issuance of the search warrant, even absent the excised portions, as stated above. Jarvi's vehicle had been stopped for a traffic violation after leaving an alleged drug house. At the time he was stopped, Higgins was a passenger in Jarvi's vehicle. Higgins stated that she had been staying with Jarvi at his residence for the last two days and had spent nearly all her time in Wichita either with Jarvi or at Jarvi's home. Records checks confirmed that the address Higgins reported was Jarvi's residence. Higgins stated that she had used methamphetamine by injection at Jarvi's residence and Lynch confirmed that Higgins had a recent injection mark. Higgins stated that Jarvi had a large amount of currency that he needed to drop to someone. Higgins stated that she personally viewed methamphetamine, a digital scale, a spoon with drug residue on it, two handguns, and a booby trap at Jarvi's residence. Higgins described some of these items in specific detail (i.e., the methamphetamine was in the basement, at 1400 hours on November 9, 2005, in a clear plastic container with a blue top, consisting of two to three ounces of methamphetamine). Higgins was a credible informant. Her statements were supported through physical

observation and records verification and she was making self-incriminating statements that an ordinary person would not make unless they were true.

Because probable cause existed to support the issuance of the search warrant for Jarvi's residence, even without evidence obtained from Jarvi as a result of the traffic stop, Jarvi's motion to suppress is DENIED.

B.  Motion in Limine

The day before the evidentiary hearing, Jarvi filed a motion in limine seeking to prohibit the government from introducing the following: 1) statements of two sources of information that had originally informed the Sedgwick County Sheriff's Office that they believed the house at which Jarvi's vehicle was first viewed was a house where methamphetamine was sold; and 2) statements from Higgins that Higgins made at the time of the roadside traffic stop regarding her consent to the search of her purse and the items found in that purse.  (Doc. 19 at 2.)  The government did not file a response to this motion.

However, because of the government's concession at the evidentiary hearing on the motion to suppress, its focus on supporting its search of Jarvi's residence based on the probable cause it developed from Higgins' interview, and the court's subsequent ruling on the motion to suppress, Jarvi's motion in limine is, in part, moot. Higgins roadside statements regarding prescription pills are not at issue in this case.

The statements to the officers from the sources of information regarding the alleged drug house remain at issue, however.  Jarvi

-11-

asserts these statements are hearsay and are therefore not admissible pursuant to Federal Rule of Evidence 802. The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c).

Jarvi's characterization of the statements as hearsay is mistaken, however. As the Rule clearly states, an out of court statement is not hearsay when it being offered, not for its truth, but merely to show knowledge that the statement was made. Here, the statement is not offered by the government to prove that the house where Jarvi's truck was parked was actually a proven drug house, but merely to show why Allen and Cocking were watching the house and that Allen and Cocking relayed the information to Lynch as their basis for thinking it was a drug house. See, e.g., United States v. Becker, 230 F.3d 1224, 1236 (10th Cir. 2000) (stating that "out of court statements are not hearsay when offered for the limited purpose of explaining why a Government investigation was undertaken"); United States v. Cass, 127 F.3d 1218, 1222-24 (10th Cir. 1997) (holding that officers may testify to out-of-court statements if those statements are few in number, confined in scope to explaining the impetus for the investigation, and not used by the government to prove elements of the crime.).

In addition, the government is correct in noting that Rule 1101(d)(1) makes the Federal Rules of Evidence inapplicable to the evidentiary hearing on the motion to suppress. United States v. Jackson, 213 F.3d 1269, 1281-82 (10th Cir. 2000) ("It is well

established that, apart from questions of privilege, the Federal Rules of Evidence do not apply in suppression hearings. . . . Furthermore, we have held hearsay evidence is admissible at suppression hearings."). Therefore, whether the statements from the sources of information are hearsay is immaterial at this stage in the case. Jarvi's motion in limine is DENIED.

**IV. CONCLUSION**

Defendant's motion to suppress is DENIED.  Defendant's motion in limine is DENIED.  The clerk is directed to set this case for trial.

IT IS SO ORDERED.

Dated this   2nd   day of April, 2007, at Wichita, Kansas.

> S/ Monti Belot
> Monti L. Belot
> UNITED STATES DISTRICT JUDGE